IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

AUG 13 2020

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

| | |
|---|---|
| BRETT WALKER <br>           Plaintiff <br><br> v. <br><br> BUBBLY BRANDS LLC, <br> NICK URBANI, OWNER OF BUBBLY BRANDS, LLC, <br> TELLO'S CREATIONS LLC, <br> ANTONIO TELLO, OWNER OF TELLO'S CREATIONS LLC, <br> TOTAL HEALTH SUPPLY, <br> ELINOR SPECTOR, OWNER OF TOTAL HEALTH SUPPLY, <br> PRIMITIVE SURVIVORS, <br> CHARLIE GUERRERO, OWNER OF PRIMITIVE SURVIVORS, <br> UNIDENTIFIED 'WAYFARER' BUSINESS, <br> UNIDENTIFIED 'HDTV' BUSINESS, <br> UNIDENTIFIED 'NEW ENERGY' BUSINESS, <br> UNIDENTIFIED 'CBD OIL' BUSINESS, <br> UNIDENTIFIED 'ELITE EDGE' BUSINESS, <br> UNIDENTIFIED 'THRIVE KETO' BUSINESS, <br> UNIDENTIFIED TELEMARKETER <br>           Defendants. | CIVIL ACTION <br><br> 1:20-CV-3348 <br><br> COMPLAINT |

## PRELIMINARY STATEMENT

1. Brett Walker, Plaintiff pro se ("Plaintiff") brings this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act ("TCPA,")

47 U.S. Code § 227, a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012.)

2. Plaintiff alleges that Bubbly Brands, LLC, its owner, and other corporations and owners ("Defendants") commissioned automated telemarketing SMS messages ("Texts") to his number on the National Do Not Call Registry. The Texts were sent pursuant to an agreement between the owners, corporations, and Defendant Unidentified Telemarketer ("Telemarketer".) The Texts come from numbers with spoofed Caller ID, vary in content but usually have a link to a shortened and short-lived URL. Sometimes the Texts have a way to request a 'STOP' to the messages. In practice that function does not stop future Texts from being sent.

## PARTIES

3. Plaintiff Brett Walker currently resides in Georgia.

4. Defendants come from multiple states, with the known locations of identified Defendants being Florida, Texas, California, and Oregon.

## JURISDICTION & VENUE

5. The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims,* 132 S. Ct. 740.

6.  The Court has personal jurisdiction over Defendants because they engaged in telemarketing Texts to Plaintiff and other potential customers into this district.

7.  Venue is proper under 28 U.S.C. § 1391(b)(1) because a substantial part of the events or omissions giving rise to the complaint occurred in this district, as the automated Texts were made to Plaintiff, who lives in Georgia.

## TCPA BACKGROUND

8.  In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227.)

9.  The FCC considers texts to be calls according to the TCPA (https://docs.fcc.gov/public/attachments/FCC-15-72A1.doc.)

10. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service or to a number that is charged per call." See 47 U.S.C. § 227(b)(1)(A). The TCPA provides a private

cause of action to persons who receive texts in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).)

## THE NATIONAL DO NOT CALL REGISTRY AND THE FCC'S CONCERNS

11.     The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." Id. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2.)

## FACTUAL ALLEGATIONS

Texts to Plaintiff

12.     Plaintiff Walker is a "person" as defined by 47 U.S.C. § 153(39). Plaintiff's telephone number, (972) 740-XXXX, is assigned to a service for which he pays for calls and texts.

13.     Plaintiff's telephone number, (972) 740-XXXX, has been easily verifiable to exist on the National Do Not Call Registry since 2003, over fifteen years before the Texts at issue.

14.     Plaintiff's telephone number, (972) 740-XXXX, is used for residential purposes only, and is not associated with any business.

a. Since 2019, Plaintiff has received, at least dozens of Texts from the Defendants, and these Texts were made with an Automatic Telephone Dialer System ("Autotexter",) a term defined by the TCPA. The Texts were made with an Autotexter because the business model of sending thousands or millions of texts is not practical for manually-manipulated texts, the Texts come from a spoofed caller ID not related to the Defendants' business, and the text is commercial in nature.

15.     The Texts vary in content, sometimes alluding to an urgent need to update shipping or delivery details for important packages. One 2019 text reads, "THIRD ALERT: Brett, please confirm your address details for shipment ID: G-58D3 HERE: l7nsd.info/LoagtMxxOv Sender: AMAZON."

16.     Given that Defendants use Plaintiff's name, and that Amazon has contacted Plaintiff from different numbers, and could use shortened hyperlinks to direct Plaintiff to an Amazon delivery preference page, Plaintiff is led to address the contents of the text, not knowing for sure if the true sender is actually Amazon, where the hyperlink points, or which package's delivery details need attention.

17.     Defendants' use of spoofed Caller IDs makes difficult any effort to identify or investigate the origin of the text message, and Defendants exploit this uncertainty leading a reasonable consumer to believe that Defendants' Texts actually come from Amazon or a legitimate actor.

18. Defendants add to their advantage by preying on a reasonable consumer's concern and care for any item they may have ordered, increasing the chances the consumer clicks on the link in the text, but the link does not go to a page controlled by the named reference (Amazon, AT&T, inter alia.)

19. The links generally go to a similarly-styled page with Amazon-familiar yellow-button links, often inviting website visitors to complete a survey, or to AT&T-branded pages with nearly-identical surveys. Both the Amazon and AT&T surveys have 'reviews' of the rewards available from identically-named people, regularly starting with 'Frank Taylor.'

20. Once complete the survey respondents are typically taken to a page advertising various baubles, from tactical flashlights to bubble bath 'bombs' to weight loss or male enhancement or protein powders and pills to handbags and beauty products, flashing an urgent countdown to take advantage of sometimes-free products that cost only a nominal shipping amount.

21. On January 21, 2020 Plaintiff identified four Defendants and sent separate letters indicating the potential for legal action, but no reply was received. Despite these letters, in the following weeks, multiple additional Texts were sent from the Telemarketer offering products from some of the Defendants, as recently as July, 2020.

Harms to Plaintiff

22.     One text causes Plaintiff's cellphone to awaken from rest mode, illuminating a light, chiming an alarm, vibrating twice, and temporarily lighting up the screen. Defendants' actions in total are a significant multiple of these interruptions.

23.     The text is a drain on Plaintiff's cellphone memory, battery and internal phone data cache when sitting in the Short Messaging Service (SMS) inbox. One text message takes up hundreds of bytes of storage, alone marginal but in volume a threat to Plaintiff's ability to operate his cellphone.

24.     Acting on the text's claim is a waste of Plaintiff's time and focus, spending energy to stop the current activity, redirect attention, get up, find the phone, address the text, then delete the message. Clicking on the text's URL link leads to more drains on Plaintiff's cellphone memory, battery and internal phone data cache when presenting the webpage contents via Plaintiff's cellphone browser.

25.     Additional time and energy are spent by the Plaintiff visiting a different internet website, including verifying Amazon delivery preferences are still correct, leading to additional losses of cellphone memory, internal data cache, and battery usage.

26.     The drain of the spam text and webpage usage caused by the Defendants' SMS and browser invasion leads Plaintiff's cellphone to perform marginally more sluggishly, slowing down Plaintiff's use of his phone for productive tasks. Additional time and energy is spent by the Plaintiff clearing browser cache data in an effort to restore the phone to optimal performance.

27. The optimal performance can be reduced, in a discrete amount, by one text and its investigation, as a typical cellphone's number of available memory data retrieval and removal cycles are not infinite. This means that the Defendants' text individually leads to a permanent loss of cellphone performance, and in total a noticeable reduction of cellphone operability. The additional battery energy expenditures caused by the Defendants leads to an overall additional drain on the cellphone's power storage capacity.

28. Plaintiff's SMS inbox is for messages between Plaintiff and his friends, family, or legitimate business whose interactions with Plaintiff are either welcome or solicited. Plaintiff never invited Telemarketer or the Other Defendants to contact him or otherwise offer any products or services.

29. Plaintiff was harmed by these Texts. They are distracting and misleading, especially when there is an invitation to set FedEx or Amazon Delivery preferences. Plaintiff was deprived of focus when responding to the Texts and his privacy was improperly invaded. These Texts injured Plaintiff because they were frustrating, obnoxious, annoying, were a nuisance, and disturbed the solitude of Plaintiff.

**OTHER DEFENDANTS' LIABILITY FOR DEFENDANT UNIDENTIFIED TELEMARKETER'S CONDUCT**

30. For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." In re Rules & Regulations Implementing the TCPA, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd. 12391, 12397, ¶ 13 (1995).

31. On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." (May 2013 FCC Ruling, 28 FCC Rcd. At 6574, ¶ 1.)

32. The May 2013 FCC Ruling held that, even absent evidence of a formal contractual relationship between the seller and telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd. at 6586, ¶ 34.

33. Defendants other than Unidentified Telemarketer, including the owners, are liable for the Texts that were initiated by Telemarketer, in part because they hired Telemarketer to originate new business using automated telemarketing Texts.

34. Defendants, other than Unidentified Telemarketer, including the owners, could have restricted Telemarketer from using an Autotexter, from calling numbers on the Do Not Call list, from spoofing the Caller ID, but did not.

35. Defendants, other than Unidentified Telemarketer, including the owners, also accepted the benefits of Telemarketer's illegal telemarketing by accepting clicks directly from Telemarketer's links despite the fact that those leads were generated through illegal telemarketing.

36. Defendants permitted Telemarketer to place Texts on Defendants' behalf as the provider of services without mentioning Defendants' name in the text, and had absolute control over whether, and under what circumstances, it would accept a customer.

37. Defendants, including the owners, knew (or reasonably should have known) that Telemarketer was violating the TCPA on its behalf and failed to take effective steps within its power to force the telemarketer to cease that conduct. Any reasonable seller that accepts telemarketing text leads from lead generators would, and indeed must, investigate to ensure that those texts were made in compliance with TCPA rules and regulations.

38. Telemarketer setup a website with links that transfer customers directly to Defendants.

39. Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships … through discovery, if they are not independently privy to such information." Id. at 6592-593, ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable

consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." Id. at 6593, ¶ 46.

## OFFICER LIABILITY FOR COMPANY CONDUCT

40. TCPA has 'pierced the corporate veil', allowing individuals to be held personally liable. *See Schumacher v. Capital Advance Solutions, LLC,* No. H-18-0436, 2019 U.S. Dist. LEXIS 34915 (S.D. Tex. Jan. 19, 2019)

41. The Defendant owners of Defendant corporations either knew or should have known the leads brought to their websites, by the Telemarketer, were being made to customers who had not provided consent, using a Autotexter, and a spoofed Caller ID.

## STANDING

42. As identified in the Factual Allegations, Plaintiff has suffered articulated and particularized harm that was caused either directly by or on behalf of the Defendants.

43. Article III "standing consists of three elements." *Spokeo,* 136 S. Ct. at 1547 (quoting *Lujan,* 504 U.S. at 560.) To establish standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* "The plaintiff, as the party invoking federal jurisdiction, bears the

burden of establishing these elements." *Id.* (citing *FW/PBS, Inc. v. Dallas,* 495 U.S. 215, 231 (1990)).

44.     In *Spokeo,* the Supreme Court held intangible injuries can be concrete and, under certain circumstances, the risk or real harm can also satisfy the requirement of concreteness. *Id.* At 1549. However, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* As such, a plaintiff may "not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." Id. (citing *Summers v. Earth Island Inst.,* 555 U.S. 488, 496 (2009) ("[D}eprivation of a procedural right without some concrete interest that is affected by the deprivation … is insufficient to create Article III standing.")) (additional citation omitted.)

## LEGAL CLAIMS

### COUNT ONE

45.     Paragraphs 1 through 48 are incorporated by reference herein as though set forth in full.

46.     Defendants violated 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)(2) by either (a) initiating multiple solicitation Texts within a 12-month period to residential telephone numbers despite their registration on the National Do Not Call Registry, or (b) accepting that others made those Texts on their behalf, without signed, written prior express invitation or permission.

47.     The Defendants' violations were negligent and/or willful.

## COUNT TWO

48.     Paragraphs 1 through 51 are incorporated by reference herein as though set forth in full.

49.     The Defendants violated the TCPA (a) by initiating automated telephone solicitations to telephone numbers, or (b) by the fact that others made those Texts on their behalf. See 47 U.S.C. § 227(b).

50.     The Defendants' violations were willful and/or knowing.

## RELIEF SOUGHT

WHEREFORE, Plaintiff prays for the following relief:

A.     Injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making texts, except for emergency purposes, to any telephone numbers using an Autodialer and/or artificial or prerecorded voice in the future.

B.     Because of Defendants' violations of the TCPA, Plaintiff Walker seeks $500 in statutory damages per violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. § 227(b)(3); 47 U.S.C. § 227(c)(5), which could mean $1,000 in damages per text or – where such regulations were willfully or knowingly violated – up to $3,000 per text. *See Charvat v. N.M.P.*

C.  Costs of litigating the action, including investigation and other reasonable attorney fees (for a pro pe litigant whose actions could benefit the general public if Defendants are prevented from further uses of Autotexters to spam consumers whose numbers may also be on the Do Not Call Registry,) including court costs

D.  Such other relief as the Court deems just and proper.

**Jury Trial Demand**

Plaintiff requests a trial by jury as to all claims of the complaint so triable.

Dated:   August 13, 2020

Respectfully Submitted,

Brett Walker
Plaintiff, pro se
435 Davis Road
Eastanollee, GA 30538
(972) 740-5846
*applecore@gmail.com*